**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

DAISY GARDEN RESTAURANT LLC
Florida Limited Liability Company
d/b/a DAISY GARDEN RESTAURANT

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues DAISY GARDEN RESTAURANT LLC, Florida Limited Liability Company, d/b/a DAISY GARDEN RESTAURANT ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations

implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.daisygardenfl.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 114 N Tennessee Ave #101, Lakeland, FL 33801 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal

access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

**PARTIES**

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a

webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Limited Liability Company with a principal place of business of 114 N Tennessee Ave #101, Lakeland, FL 33801 (hereinafter “Defendant’s Principal Place of Business”).

16. Defendant operates a restaurant at Defendant’s Principal Place of Business, serving food and beverages including sushi, hibachi entrées, appetizers, and cocktails. Defendant operates Defendant’s Website, through which consumers can review its menu, place online orders, obtain catering information, join its VIP list, and find the restaurant’s hours, contact information, and location.

17. Defendant owns, operates, maintains, and/or controls Defendant’s Website and is responsible for the policies, practices, and procedures concerning Defendant’s Website development and maintenance.

18. Defendant’s Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant’s Principal Place of Business is also referenced as a “place of public accommodation.”

19. Defendant operates its restaurant from its Principal Place of Business in Lakeland, Florida, and maintains Defendant’s Website as a digital extension of that physical establishment. Defendant’s Website is accessible to consumers through the internet and provides information about goods and services offered at

Defendant's physical location. Through Defendant's Website, consumers can review the menu and food and beverage offerings, place online orders, inquire about catering, join the VIP list, and obtain Defendant's hours, contact information, and location. Defendant's Website is operated in connection with Defendant's Principal Place of Business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to submit a catering request for Defendant's physical restaurant, the same function available to non-disabled customers through Defendant's Website. When MACON attempted to select a date on the catering form, the date picker did not respond to the tab or arrow keys and his screen reader announced only "Blank." This barrier prevented MACON from independently selecting a date and completing the catering request with his screen reader software. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and

confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. April 13, 2026;

b. April 24, 2026; and

c. September 22, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and

equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on April 24, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website. Plaintiff's expert's October 1, 2026 retest, attached hereto as "Exhibit C," confirms that those barriers remain.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the

discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate

> commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

42 U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class

1 Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant

2 42 U.S.C. § 12188(b).
3 42 U.S.C. § 12188(a).
4 Johnson, *supra* note 8.
5 *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
6 *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).
7 Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides contact information, the physical address, operating hours, and access to information about food and beverages offered at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to shop and pre-shop Defendant's food and beverage offerings, review its menu, place an online order, obtain catering information, and access contact and location information through Defendant's Website from home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or

accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of

making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Missing Accessible Name for Facebook Link**

i. **Issue:** The Facebook link present on the page lacks an accessible name, meaning no meaningful label is announced to screen reader users. Without a descriptive label provided through visible text, alt text, or an aria-label attribute, assistive technologies are unable to convey the purpose or destination of the link. This renders the link functionally unidentifiable and unusable for individuals who depend on assistive technologies to navigate web content.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind or have visual disabilities, the absence of an accessible name on the Facebook link creates a complete barrier to understanding and interacting with it. Screen readers announce the link without any meaningful context, leaving users unable to determine its purpose or destination. This forces blind users to either skip

the link entirely or activate it without knowing where it leads, undermining their ability to navigate the page independently, safely, and with confidence.

**b. Missing Alternative Text for "Daisy Garden" Image Link**

i. **Issue:** The "Daisy Garden" image, which functions as a clickable link, does not include an alt attribute. Screen reader users rely on alternative text to understand both the content of an image and the purpose of any link it represents. Without this attribute, the link is announced without a meaningful name, making it impossible for users who depend on assistive technologies to determine what the link represents or where it will navigate them. This omission renders the link inaccessible and prevents meaningful interaction.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 2.4.4 - A - Non Text Content

iii. **Impact:** For users who are blind or have visual disabilities, the absence of alternative text on the "Daisy Garden" image link creates a significant barrier to access. Screen readers are unable to announce a meaningful name for the link, leaving blind users without any indication of its content or destination. This prevents them from making informed decisions about whether to activate the link and effectively excludes them from engaging with this navigational element. All image-based links must include concise, descriptive alternative text that communicates the link's purpose to ensure equitable access for all users.

**c. Hidden Focusable Elements in the Page**

i. **Issue:** Certain elements on the page are visually hidden yet remain accessible to keyboard navigation, allowing focus to be placed on content that is not visible to the user. When keyboard users navigate through the page, focus moves to these concealed elements, creating a disorienting experience

in which the focus indicator disappears or moves to an undetectable location. Screen reader users may also encounter content announced by assistive technologies that does not correspond to anything visible on the screen, resulting in confusion and an inability to navigate the page reliably.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 2.1.1 - A, 1.3.2 - A - Focus Order

iii. **Impact:** For users who are blind or have visual disabilities, the presence of hidden focusable elements creates serious navigational barriers. Blind users relying on screen readers may encounter content announced out of sequence or inconsistent with the visible page layout, making it extremely difficult to understand their current position within the page. This disruption to the logical focus order

undermines the user's ability to navigate efficiently and independently, and may cause them to miss critical content or become entirely disoriented during interaction.

**d. Missing H1 Heading on the Page**

i. **Issue:** The page does not include a primary heading at the H1 level to identify its overall purpose and content. Screen reader users depend on a clearly defined heading structure, particularly an H1, to orient themselves upon arriving at a page and to quickly locate the main content. The absence of an H1 heading deprives users of this essential structural landmark, making it impossible for those who rely on heading-based navigation to determine the primary subject or context of the page.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities, the absence of an H1 heading on the page presents an immediate and significant barrier to orientation and comprehension. Blind users typically navigate pages by moving through headings using their screen reader, and without an H1, they have no programmatic means of identifying the page's primary purpose upon arrival. This forces blind users to listen through all page content sequentially in order to understand its context, placing an unnecessary and disproportionate burden on them and severely limiting their ability to navigate the page efficiently and independently.

**e. Missing Heading Structure for About Us Text**

i. **Issue:** The "About Us" text is displayed on the page without the use of appropriate semantic heading elements, such as those ranging from H1 to H6. Screen reader users rely on a proper heading hierarchy to understand the structure of a page and to navigate between sections efficiently. Without designated heading markup, users are unable to identify the beginning or relative importance of the "About Us" section,

and heading-based navigation commands within assistive technologies will fail to locate this content. As a result, the section becomes difficult to access and users risk missing the information it contains.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities, the absence of proper heading structure for the "About Us" section creates a meaningful barrier to content discovery and navigation. Blind users who rely on screen readers to move through pages by heading cannot locate or jump to this section, as it is not programmatically identified as a heading. This forces them to navigate through all preceding content linearly in order to reach the "About Us" information, significantly increasing the time and effort

required to access content that sighted users can identify at a glance. The lack of semantic structure effectively excludes blind users from efficient and independent interaction with this section of the page.

**f. Missing Heading Structure for Catering Text**

i. **Issue:** The "Catering" text is rendered as plain text without the use of semantic heading elements (such as `` through ``), meaning it is not programmatically conveyed as a section heading. Screen reader users depend on properly structured headings to understand page layout and to navigate efficiently between sections. Without a defined heading, users cannot identify the beginning or relative importance of this section, nor can they use heading-based navigation commands to move to it. Consequently, the section remains inaccessible through standard assistive technology navigation patterns, and users risk overlooking critical content.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers, the absence of a semantic heading for the "Catering" section eliminates the ability to identify, navigate to, or understand the significance of this content within the page structure. Without a proper heading element, assistive technologies cannot announce the section, forcing blind users to traverse all page content linearly without any structural cues. This results in a significant navigational barrier, increases cognitive load, and raises the likelihood that essential catering-related information will be missed entirely. The "Catering" text should be marked up with an appropriate heading element to define its role within the page hierarchy, enabling screen readers to

announce it correctly and allowing users to navigate directly to the section using heading navigation shortcuts. A primary heading should clearly identify the section, with subheadings applied as needed to reflect content hierarchy.

**g. Missing Heading Structure for Join Our VIP Text**

i. **Issue:** The "Join our VIP" text is rendered as plain text without the use of semantic heading elements (such as `` through ``), meaning it is not programmatically conveyed as a section heading. Screen reader users depend on properly structured headings to understand page layout and to navigate efficiently between sections. Without a defined heading, users cannot identify the beginning or relative importance of this section, nor can they use heading-based navigation commands to move to it. Consequently, the section remains inaccessible through standard assistive technology navigation patterns, and users risk overlooking critical content.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers, the absence of a semantic heading for the "Join our VIP" section eliminates the ability to identify, navigate to, or understand the significance of this content within the page structure. Without a proper heading element, assistive technologies cannot announce the section, forcing blind users to traverse all page content linearly without any structural cues. This results in a significant navigational barrier, increases cognitive load, and raises the likelihood that essential VIP-related information will be missed entirely. The "Join our VIP" text should be marked up with an appropriate heading element to define its role within the page hierarchy, enabling screen readers to announce it

correctly and allowing users to navigate directly to the section using heading navigation shortcuts. A primary heading should clearly identify the section, with subheadings applied as needed to reflect content hierarchy.

**h. Missing Skip to Content Link**

i. **Issue:** The page does not include a "Skip to main content" link at the beginning of the document, which would otherwise allow keyboard users to bypass repeated navigation elements and proceed directly to the primary content area. The absence of this mechanism forces keyboard users to tab through every navigation item and repeated interface element before reaching the main content on each page load or navigation event, creating a significant and unnecessary barrier to efficient page interaction.




ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind and navigate exclusively by keyboard in conjunction with a screen reader, the lack of a skip navigation link means that every session requires traversing the entire set of repeated navigation elements before any primary content can be reached. This is not only time-consuming and exhausting but also creates a disproportionate burden compared to the experience of sighted users. A visible-on-focus "Skip to main content" link should be provided at the very beginning of the page so that, when activated, keyboard focus is transferred directly to the main content area, enabling efficient and equitable access to page content.

**i. Required Fields Are Not Identified Visually or Programmatically**

i. **Issue:** Form fields that are required for submission are neither visually distinguished nor programmatically designated as required. There is no visual indicator, such as an asterisk accompanied by an explanatory note, to inform sighted users which fields must be completed. Furthermore, no programmatic attribute, such as the `required` attribute

or `aria-required="true"`, has been applied to communicate the required status to assistive technologies. This dual absence creates a barrier for both screen reader users and sighted users who depend on visual cues, as neither group can reliably determine which fields are mandatory prior to attempting form submission.




ii. **WCAG 2.1 AA Violations:** 3.3.2 - A - Labels Or Instructions

iii. **Impact:** For users who are blind and rely on screen readers to complete online forms, the failure to programmatically identify required fields means that assistive technologies cannot announce the mandatory status of any form field. As a result, blind users may submit incomplete forms without any prior indication that certain fields are obligatory, leading to error states that are equally inaccessible if not

properly handled. This creates a frustrating and inequitable form experience that may prevent blind users from successfully completing critical transactions. Required fields should be clearly identified both visually, using an asterisk and an accompanying legend, and programmatically, using the `required` attribute or `aria-required="true"`, so that assistive technologies can announce the required status at the point of field focus.

j. **Missing Heading Structure for "Book Your Next Catering Event or Party With Us!" Text**

i. **Issue:** The "Book your next catering event or party with us!" text is rendered as plain text without the use of semantic heading elements (such as `` through ``), meaning it is not programmatically conveyed as a section heading. Screen reader users depend on properly structured headings to understand page layout and to navigate efficiently between sections. Without a defined heading, users cannot identify the beginning or relative importance of this section, nor can they use heading-based navigation commands to move to it. Consequently, the section remains inaccessible through

standard assistive technology navigation patterns, and users risk overlooking critical content.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers, the absence of a semantic heading for the "Book your next catering event or party with us!" section eliminates the ability to identify, navigate to, or understand the significance of this content within the page structure. Without a proper heading element, assistive technologies cannot announce the section, forcing blind users to traverse all page content linearly without any structural cues. This results in a significant navigational barrier, increases cognitive load, and raises the likelihood that essential booking-related information will be missed entirely. The

"Book your next catering event or party with us!" text should be marked up using an `` heading element to define its role within the page hierarchy, enabling screen readers to announce it correctly and allowing users to navigate directly to the section using heading navigation shortcuts. Subheadings should be applied as needed to accurately reflect the content hierarchy beneath it.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about April 19, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. Following MACON's pre-suit communication of April 24, 2026, Plaintiff's expert again audited Defendant's Website on or about May 12, 2026, using screen reader software. That audit documented twelve (12) access barriers in violation of WCAG 2.1 Level A Success Criteria, including the inaccessible date picker on Defendant's catering form that MACON personally encountered, as

described in paragraph 22 above. A true and correct copy of the May 12, 2026 audit report is attached hereto as "Exhibit B," and its contents are incorporated herein by reference.

53. On or about October 1, 2026, more than five (5) months after Defendant received MACON's pre-suit communication, Plaintiff's expert retested Defendant's Website using screen reader software. The retest confirmed that the access barriers set forth in paragraph 50 above remain present on Defendant's Website. Specifically, eight (8) of the barriers documented in the May 12, 2026 audit persist unchanged: (i) the missing accessible name for the Facebook link (WCAG 4.1.2); (ii) the missing alternative text for the "Daisy Garden" image link (WCAG 1.1.1, 2.4.4); (iii) hidden focusable elements (WCAG 2.4.3, 2.1.1, 1.3.2); (iv) the missing H1 heading (WCAG 1.3.1); and (v)-(viii) the missing heading structure for the "About Us," "Catering," "Join Our VIP," and "Book your next catering event or party with us!" text (WCAG 1.3.1). In addition, Defendant's Website continues to fail WCAG 2.1 Success Criterion 2.4.1 (Bypass Blocks): the non-functional "Skip to Content" link documented on May 12, 2026 is no longer present at all, leaving users with no mechanism to bypass repeated content. The catering form likewise continues to fail WCAG 2.1 Success Criterion 3.3.2 (Labels or Instructions), as required fields are neither visually nor programmatically

identified. A true and correct copy of the October 1, 2026 retest report is attached hereto as "Exhibit C," and its contents are incorporated herein by reference.

54. Defendant's failure to remediate these barriers despite actual notice, and despite having more than five (5) months to do so, confirms that Defendant's violations are ongoing, that Defendant has not adopted policies and practices sufficient to ensure the accessibility of Defendant's Website, and that injunctive relief is necessary to secure MACON's full and equal access.

55. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

56. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

57. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

58. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50 through 54 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

59. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

60. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on April 24, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

61. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

62. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12188 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

63. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

64. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

65. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually

disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for

such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines,

and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

**Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing**

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: The firm's case-management software uses AI to populate documents with case-specific information from the firm's records, creating a preliminary draft. Before filing, the signing attorney independently verifies that information against the underlying records, makes any necessary revisions, and reviews and finalizes the document. This automated population process does not perform legal research or generate case citations. The attorney then continues working on the document, reviewing all initial entries, and finalizing it before filing. The Case Management Software input does not involve legal research or case citations. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not

exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.

Dated: October 16, 2026

Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**